## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## NORTHERN DIVISION

NANCY ROBINSON,                )
    Plaintiff,               )
                              )
v.                             )        **Civil Action No. 14-00084-N**
                              )
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security, )
    Defendant.               )

## MEMORANDUM OPINION AND ORDER

Social Security Claimant/Plaintiff Nancy Robinson ("Robinson") has brought this action under 42 U.S.C. § 1383(c)(3) seeking judicial review of a final decision of the Defendant Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c.[1]  (*See* Doc. 1).  By the consent of the parties (*see* Doc. 22), the Court has designated the undersigned United States Magistrate Judge to conduct all proceedings and order the entry of judgment in this civil action under 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.[2]  (*See* Doc. 23).

The parties have waived oral argument (*see* Docs. 21, 24), and this action is

---

[1] Robinson alleges (*see* Doc. 1 at 1, ¶ 2), and the Commissioner admits (*see* Doc. 13 at 1, ¶ 1), that she resides in this judicial district.  Thus, venue is proper in this Court.  *See* 42 U.S.C. §§ 1383(c)(3) ("The final determination of the Commissioner of Social Security after a hearing [on a claim for supplemental security income] shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.") and 405(g) ("Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business…").

[2] Thus, an appeal taken from the judgment entered in this action may be made directly to the Eleventh Circuit Court of Appeals.

ripe for adjudication.  Upon consideration of the parties' briefs (Docs. 17, 18, 19) and the relevant portions of the administrative record (Doc. 14) (hereinafter cited as "(R. [page number(s)])"), the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I.    Procedural Background

On March 30, 2007, Robinson protectively filed with the Social Security Administration ("SSA") an application SSI, alleging disability beginning March 30, 2007. [3]  After her application was initially denied on July 13, 2007, Robinson requested a hearing on her application.   A hearing was held before an Administrative Law Judge ("ALJ") on March 25, 2010.  Subsequent to that hearing, additional evidence was submitted, and a supplemental hearing was held on July 1, 2010, in Montgomery, Alabama.  (*See* R. 51).

On September 10, 2010, the ALJ issued an unfavorable decision on Robinson's application.  (R. 48-65).  Robinson requested review of the ALJ's decision by the Appeals Council for the SSA's Office of Disability Adjudication and Review. On January 14, 2014, the Appeals Council issued its decision denying Robinson's request for review.  (R. 1-5).

Robinson timely filed this action under § 1383(c)(3) for judicial review of the Commissioner's final decision on February 25, 2014.   (*See* Doc. 1); *Ingram v.*

---

[3] "SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability."  *Sanders v. Astrue*, Civil Action No. 11-0491-N, 2012 WL 4497733, at *3 (S.D. Ala. Sept. 28, 2012) (citing 42 U.S.C. 1382(a), 1382c(a)(3)(A)-(C)).  "For SSI claims, a claimant becomes eligible in the first month where she is both disabled and has an SSI application on file."  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam) (citing 20 C.F.R. § 416.202–03 (2005)).

*Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1262 (11th Cir. 2007) ("The settled law

of this Circuit is that a court may review, under sentence four of section 405(g), a

denial of review by the Appeals Council."); 42 U.S.C. § 405(g) ("Any individual, after

any final decision of the Commissioner of Social Security made after a hearing to

which he was a party, irrespective of the amount in controversy, may obtain a

review of such decision by a civil action commenced within sixty days after the

mailing to him of notice of such decision or within such further time as the

Commissioner of Social Security may allow.").[4]

## II.   <u>Standard of Review</u>

> The Social Security Regulations outline a five-step, sequential
> evaluation process used to determine whether a claimant is disabled:
> (1) whether the claimant is currently engaged in substantial gainful
> activity; (2) whether the claimant has a severe impairment or
> combination of impairments; (3) whether the impairment meets or
> equals the severity of the specified impairments in the Listing of
> Impairments; (4) based on a residual functional capacity ("RFC")
> assessment, whether the claimant can perform any of his or her past
> relevant work despite the impairment; and (5) whether there are
> significant numbers of jobs in the national economy that the claimant
> can perform given the claimant's RFC, age, education, and work
> experience.

*Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citing 20

C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Phillips v. Barnhart*, 357 F.3d

1232, 1237-39 (11th Cir. 2004)).[5]  This five-step evaluation process "is used to

---

[4] "The final determination of the Commissioner of Social Security after a hearing [for SSI benefits] shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

[5] The Court will hereinafter use "Step One," "Step Two," etc. when referencing individual steps of this five-step sequential evaluation.

determine disability for both SSI and DIB [Disability Insurance Benefit[6]]  claims." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1030–31 (11th Cir.1986); 20 C.F.R. § 416.912 (2005) (five-step determination for SSI); 20 C.F.R. § 404.1520 (2005) (five-step determination for DIB)).

"These regulations place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (per curiam) (citing *Spencer v. Heckler*, 765 F.2d 1090, 1093 (11th Cir. 1985)).   "In determining whether the claimant has satisfied this initial burden, the examiner must consider four factors: (1) objective medical facts or clinical findings; (2) the diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education, and work history." *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983) (per curiam)).   "These factors must be considered both singly and in combination.  Presence or absence of a single factor is not, in itself, conclusive." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983) (citations omitted).

If, in Steps One through Four of the five-step evaluation, a plaintiff proves that he or she has a qualifying disability and cannot do his or her past relevant work, it then becomes the Commissioner's burden, at Step Five, to prove that the plaintiff is capable—given his or her age, education, and work history—of engaging in another kind of substantial gainful employment that exists in the national

---

[6] Title II of the Social Security Act, 42 U.S.C. §§ 401-433.

economy. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Sryock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985). Finally, but importantly, although "the [plaintiff] bears the burden of demonstrating the inability to return to [his or] her past relevant work, the Commissioner of Social Security has an obligation to develop a full and fair record." *Shnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (citations omitted).

"In Social Security appeals, [the Court] must determine whether the Commissioner's decision is ' "supported by substantial evidence and based on proper legal standards. Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." ' " *Winschel*, 631 F.3d at 1178 (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (per curiam) (internal citation omitted) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997))). "In determining whether substantial evidence exists, [a court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). However, the Court " 'may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].' " *Winschel*, 631 F.3d at 1178 (quoting *Phillips,* 357 F.3d at 1240 n.8 (alteration in original) (quoting *Bloodsworth*, 703 F.2d at 1239)). Even if the evidence preponderates against the Commissioner's findings, [a court] must affirm if the decision reached is ***supported by*** substantial evidence." *Davison v. Astrue*, 370 F. App'x 995, 996 (11th Cir. 2010)

(per curiam) (unpublished)[7] (citing *Crawford*, 363 F.3d at 1158-59) (emphasis added). "Yet, within this narrowly circumscribed role, [courts] do not act as automatons. [The court] must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence[.]" *Bloodsworth*, 703 F.2d at 1239 (citations and quotation omitted).

Moreover, "[t]here is no presumption…that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that the legal conclusions reached were valid. Instead, [the court] conduct[s] 'an exacting examination' of these factors." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam) (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)) (internal citation omitted). *See also Moore,* 405 F.3d at 1211 ("In Social Security appeals, we review *de novo* the legal principles upon which the Commissioner's decision is based. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). However, we review the resulting decision only to determine whether it is supported by substantial evidence. *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158–59 (11th Cir. 2004)).

When, as here, "no new evidence is presented to the Appeals Council and it denies review, then the administrative law judge's decision is necessarily reviewed as the final decision of the Commissioner…" *Ingram*, 496 F.3d at 1262.

---

[7] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014). *See also Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 n.7 (11th Cir. 2007) ("Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants.").

### III.   Claims on Appeal

**Claim 1** –   "The ALJ abused his discretion when he substituted his own

uninformed medical evaluation for the opinions of Dr. Huey Kidd and

Dr. Donald Blanton, and the ALJ failed to conduct a full and fair

hearing."

**Claim 2** -   "The ALJ relied on evidence that was inconsistent with the regulatory

definition of unskilled work."

**Claim 3** -   "The ALJ's residual functional capacity assessment is not supported by

substantial evidence, as it did not account for Ms. Robinson's diabetes."

(Doc. 18 at 2).[8]

### IV.   Analysis

#### A.   Claim 1

At Step Four,

the ALJ must assess: (1) the claimant's residual functional capacity ("RFC"); and (2) the claimant's ability to return to her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). As for the claimant's RFC, the regulations define RFC as that which an individual is still able to do despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). Moreover, the ALJ will "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the case. 20 C.F.R. § 404.1520(e). Furthermore, the RFC determination is used both to determine whether the claimant: (1) can return to her past relevant work under the fourth step; and (2) can adjust to other work under the fifth step…20 C.F.R. § 404.1520(e).

If the claimant can return to her past relevant work, the ALJ will conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv) & (f). If the claimant cannot return to her past

---

[8] Because Claim 2 asserts error at Step Five, the Court will address it last, as Claims 1 and 3 assert errors in previous steps of the ALJ's analysis.

7

relevant work, the ALJ moves on to step five.

> In determining whether [a claimant] can return to her past relevant work, the ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. 20 C.F.R. § 404.1520(e). That is, the ALJ must determine if the claimant is limited to a particular work level. *See* 20 C.F.R. § 404.1567. Once the ALJ assesses the claimant's RFC and determines that the claimant cannot return to her prior relevant work, the ALJ moves on to the fifth, and final, step.

*Phillips*, 357 F.3d at 1238-39 (footnote omitted).

" 'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions.' " *Winschel*, 631 F.3d at 1178-79 (quoting 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). ALJs "must always carefully consider medical source opinions about any issue…" Social Security Ruling (SSR) 96-5P (S.S.A. July 2, 1996).[9]

"In assessing medical opinions, the ALJ must consider a number of factors in determining how much weight to give to each medical opinion, including (1) whether the physician has examined the claimant; (2) the length, nature, and extent of a treating physician's relationship with the claimant; (3) the medical evidence and explanation supporting the physician's opinion; (4) how consistent the

---

[9] " 'Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.' *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9, 110 S. Ct. 885, 891 n.9, 107 L. Ed. 2d 967 (1990) (internal quotations omitted). Although SSA rulings are not binding on this Court, we accord the rulings deference. *See Fair v. Shalala*, 37 F.3d 1466, 1468–69 (11th Cir. 1994)." *De Olazabal v. Soc. Sec. Admin., Com'r*, 579 F. App'x 827, 832 (11th Cir. 2014) (per curiam) (unpublished).

physician's opinion is with the record as a whole; and (5) the physician's specialization.   These factors apply to both examining and non-examining physicians." *Eyre v. Comm'r, Soc. Sec. Admin.*, 586 F. App'x 521, 523 (11th Cir. Sept. 30, 2014) (per curiam) (unpublished) (internal citations and quotation marks omitted) (citing 20 C.F.R. §§ 404.1527(c) & (e), 416.927(c) & (e)).  "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179 (citing *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam)).  However, the ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *Bloodsworth*, 703 F.2d at 1240.  *Accord, e.g.*, *Anderson v. Comm'r of Soc. Sec.*, 427 F. App'x 761, 763 (11th Cir. 2011) (per curiam) (unpublished).

Robinson argues that the ALJ erred in rejecting the medical opinions of Dr. Huey Kidd ("Dr. Kidd"), who administered Robinson "a physical evaluation…on May 27, 2009[,]" and was considered a "consultative examiner," and Dr. Donald Blanton ("Dr. Blanton"), who, at the request of Robinson's attorney performed a mental examination of Robinson on September 9, 2009.  (R. 58, 62).[10]

### 1.   Dr. Kidd

Per the ALJ's opinion when determining Robinson's RFC at Step Four, Dr. Kidd's "[p]hysical evaluation of [Robinson] was generally unremarkable except she was unable to heel walk due to pain in her heels and her ability to squat was

---

[10] Robinson has not argued that the ALJ improperly rejected the opinion of a treating physician.  *See Winschel*, 631 F.3d at 1179 ("Absent good cause, an ALJ is to give the medical opinions of treating physicians substantial or considerable weight." (quotation marks omitted)).

somewhat limited because of reported limitation.   Dr. Kidd's impression included foot pain, hypertension, and diabetes." (R. 58).   The ALJ had previously found that Robinson's "bilateral foot pain of uncertain etiology" constituted a severe impairment but that her hypertension and diabetes were "non-severe" impairments, as medical evidence had indicated both of these impairments were "well controlled." (R. 53, 58).

In addition, Dr. Kidd "completed a Medical Source Statement of Ability to do Work-Related Activities (Physical)[,]" in which he

> opined that the claimant could frequently lift 20 pounds, frequently carry 10 pounds, and occasionally carry 20 pounds; she is unable to sit, but she can stand for 5 minutes at one time and 30 minutes in an 8-hour workday and walk 30 minutes in an 8-hour workday; she can continuously reach, handle, finger, feel, and push/pull bilaterally; she can continuously use her feet for operation of foot controls bilaterally; she can frequently balance and stoop, occasionally climb stairs and ramps, kneel and crouch, and never climb ladders or scaffolds and crawl; and; she can tolerate continuous exposure to extreme heat and vibrations, frequent exposure to humidity and wetness, pulmonary irritants, and extreme cold, occasional exposure to moving mechanical parts, and no exposure to unprotected heights or operating a motor vehicle.

(R. 58 (citing "Exhibits 11F & 26F" [R. 571-79,  671-88])).

The ALJ found that Dr. Kidd's medical opinion was "not entitled to significant weight because it is internally inconsistent[,]" explaining: "Specifically, his opinion is inconsistent concerning the limitations he gave for lifting and carrying, and concerning the limitations he gave for sitting, standing, and walking because there is no explanation in the diagnostic findings as to why the claimant can frequently stoop but never sit." (R. 63).   The ALJ further discredited Dr. Kidd's

opinion by finding that "the subjective complaints of foot pain reported by the claimant at the evaluation are inconsistent with the claimant's longitudinal treatment history and the findings of her orthopedic evaluation in Exhibit 30F [R. 700-15]." (*Id.*).

While Robinson "does not believe Dr. Kidd's opinion is inconsistent with the record as a whole," she initially argues that, if "the ALJ indicated he felt there was an inconsistency, he had a duty to recontact Dr. Kidd, but made no effort at all, despite 20 CFR § 404.1520b." (Doc. 18 at 4). The ALJ cannot be faulted for failing to heed this regulation, however, as § 404.1520b and its SSI counterpart, 20 C.F.R. § 416.920b,[11] did not take effect until March 26, 2012, after the ALJ had already issued his determination. *See Gray v. Astrue*, No. 2:10-CV-507, 2012 WL 1521259, at *3 n.1 (E.D. Pa. May 1, 2012) ("The SSA eliminated § 404.1512(e) effective March 26, 2012, thus 'modifying the requirement to recontact [a claimant's] medical source(s),' ostensibly to give 'adjudicators more flexibility in determining how best to obtain this information.' *See generally How We Collect and Consider Evidence of Disability*, 77 Fed. Reg. 10,651 (Feb. 23, 2012). 20 C.F.R. § 416.920b explains the new protocol for recontacting medical sources.").

Even if § 416.920b had applied, however, the Commissioner correctly notes that the regulation "does not require an ALJ to recontact a medical source whenever the source's opinion contains inconsistencies." (Doc. 19 at 6). Instead, the regulation states: "If any of the evidence in your case record, including any medical

---

[11] As the Commissioner correctly notes (*see* Doc. 19 at 5 n.4), because this appeal involves only a claim for SSI, § 404.1520b is inapplicable.

opinion(s), is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have." 20 C.F.R. § 416.920b(b).  Thus, a mere determination that a medical opinion is inconsistent does not require an ALJ to recontact the source.  An ALJ, among other courses of action, "**may** recontact [the claimant's] treating physician, psychologist, or other medical source" if "the evidence is consistent but [the ALJ] ha[s] insufficient evidence to determine whether [the claimant is] disabled, or if after weighing the evidence [the ALJ determine[s he] cannot reach a conclusion about whether [the claimant is] disabled  *Id.* § 416.920b(c)(1) (emphasis added).   Even then, the regulation gives ALJs discretion in "determin[ing] the best way to resolve [an] inconsistency or insufficiency[,]…depend[ing] on the nature of the inconsistency or insufficiency."  *Id.* § 416.920b(c).

The version of  20 C.F.R. § 416.912 effective at the time of Robinson's hearings and the ALJ's issuance of his unfavorable decision provided:  "When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information…[w]e will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved…"  20 C.F.R. § 416.912(e)(1) (effective August 1,

2006 to November 11, 2010). *See also Couch v. Astrue*, 267 F. App'x 853, 855 (11th Cir. Feb. 29, 2008) (per curiam) (unpublished) ("Medical sources should be recontacted when the evidence received from that source is inadequate to determine whether the claimant is disabled." (citing 20 C.F.R. §§ 404.1512(e) and 416.912(e)); *Gray*, 2012 WL 1521259, at *3 n.1 ("All the relevant events in this matter took place under the 'old' regulations cited by the SSA, and our analysis proceeds accordingly."). The duty to recontact under the old version of § 416.912(e) did not arise if, overall, substantial record evidence supports the ALJ's determination that a claimant is not disabled. *Cf. Couch*, 267 F. App'x at 855-56 ("Couch next argues that the ALJ was required…to recontact Dr. Figueroa after deciding that his opinion was without record support, and the ALJ's failure to seek clarification of the reasons underlying Dr. Figueroa's disability opinion requires reversal… The record reflects that the duty to recontact did not arise here. First, substantial evidence, including the evaluations of two other consulting psychologists, Couch's reported daily activities, and Dr. Figueroa's own treatment notes, supported the ALJ's determination that Couch was not disabled. Additionally, it appears that the ALJ was in possession of all of Dr. Figueroa's medical records, and the information contained therein was adequate to enable the ALJ to determine that Couch was not disabled. Therefore, there was no need for additional information or clarification.").

Robinson further argues that "there are no other medical opinions in the record that the ALJ determined should be given substantial weight" and that, "[b]y simply rejecting [Dr. Kidd's] medical opinion, with no other existing medical

opinion, the ALJ improperly p[laced [sic] himself in the shoes of the physician."
(Doc. 18 at 13 (citing *Marbury v. Sullivan*, 957 F.2d 837, 840-41 (11th Cir. 1992)
(Johnson, J., concurring) ("Although Social Security disability benefits must be
reserved only for those who qualify to receive them, an ALJ may not arrogate the
power to act as both judge and physician. The ALJ in this case clearly exceeded his
legal authority by allowing his personal views regarding the non-physical source of
Marbury's seizure disorder to interfere with his responsibilities to administer fairly
the Social Security disability programs. On remand, let us hope that the ALJ
refrains from playing doctor and instead satisfies himself with merely serving as a
judge.")). [12]

The Court finds that the ALJ's decision not to credit Dr. Kidd's opinion was
rational because substantial record evidence supported a contrary conclusion.[13]  At
her first SSA hearing, Robinson testified to experiencing foot pain, rating the pain

---

[12] Robinson fails to note in her brief that the proposition for which she cites *Marbury* is
not found in the majority opinion but is instead from the specially concurring opinion of
a single panel member.   While certainly forceful and persuasive, the specially
concurring opinion is not binding precedent, and Robinson's failure to identify it as such
could be deemed misleading (though the undersigned will assume mere negligence in
this instance).  *Cf. Langley v. Astrue*, 777 F. Supp. 2d 1250, 1257-58 (N.D. Ala. 2011)
(finding that the plaintiff's attorney made an "obvious attempt to mislead the court" by
characterizing a quotation from a former Fifth Circuit opinion as binding precedent,
where the quotation was merely descriptive of another circuit's holding and, when put
in context with the surrounding language in the opinion, did not support the
proposition for which the plaintiff cited it); *Rohm & Haas Co. v. Utica Mut. Ins. Co.*,
Civil Action No. 07-584, 2008 WL 2517176, at *2 n.4 (E.D. Pa. June 23, 2008) ("While
both parties cited *Gallatin Fuels* in their briefs, neither party disclosed that the case is
non-precedential. In fact, Rohm and Haas stated that '*Gallatin Fuels* controls this
case.'…Under the circumstances, while the case is informative, to say that it is
'controlling' is at least an intemperate overstatement.").

[13] The Court expresses no opinion on the ALJ's alternative rejection of Dr. Kidd's opinion as
internally inconsistent.

at "10/10" but at "8 to 9/10" after she started wearing a brace.  (R. 60).  At her follow-up hearing, Robinson testified that she "continues to wear the brace on her left foot because without the brace, her foot 'balls up' and she cannot walk" and that she "walks with a limp because of her foot problem."  (*Id.*).  Robinson also testified that she "takes Tramadol three times daily for pain," which "causes her to be 'spaced out.'"  (*Id.*).

The ALJ found Robinson's "statements concerning the intensity, persistence and limiting effects of" her foot pain to be "not credible to the extent they are inconsistent with" the ALJ's RFC assessment.  (*Id.*).  The ALJ noted that, despite Robinson's testimony of foot pain at her SSA hearings, she, "on multiple occasions, denied joint pain or swelling" and "failed to even mention foot pain on numerous occasions…"  (R. 60-61 (citing Exhibits 5F [R. 534-46] & 30F [R. 700-15])).  Noting that "symptoms alone do not establish disability unless medical signs and laboratory findings show there is a medically determinable impairment that could reasonably be expected to produce the symptoms alleged[,]" the ALJ further found:

> The record reflects excessive symptomology and not enough pathology; not only has [Robinson] only intermittently complained of her symptoms, nerve conduction studies were negative and x-rays showed no major arthritic changes.  Additionally, her station and gait were also noted as normal (Exhibits 26F [Dr. Kidd's report] & 30F [Dr. Suddath's report]), she was able to stand on the leg independently, and she was able to heel and toe walk (Exhibit 30F).  Yet, at the consultative examination, the claimant stated she was unable to heel walk due to reported pain (Exhibit 30F).  It is also noted that the claimant also reported that she could sit in a chair "as long as I like" (Exhibit 30F), but yet she testified that she is limited to sitting for 10 minutes.  However, at numerous times, the claimant has also reported that she sits on the sofa most of the day, watching television. Although the inconsistent information throughout the record may not

be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

(R. 62).

Dr. Kidd's medical evaluation encapsulates the ALJ's complaint of "excessive symptomology and not enough pathology."  Dr. Kidd cited no medical signs or laboratory tests to support his assessment (with regard to Robinson's diabetes and hypertension, as well as her foot pain), and his opinions appear to be based solely on Robinson's subjective complaints regarding her symptoms.  (R. 572).  *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.").  *See Markuske v. Comm'r of Soc. Sec.*, 572 F. App'x 762, 766 n.3 (11th Cir. July 17, 2014) (per curiam) (unpublished) (" 'A treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.' *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quotation marks omitted). Thus, an ALJ may discount a treating physician's opinion where it 'appears to be based primarily on [the claimant's] subjective complaints of pain.' *Id.*"); *Costigan v. Comm'r, Soc. Sec. Admin.*, No. 14-11950, 2015 WL 795089, at *5 (11th Cir. Feb. 26, 2015) (per curiam) (unpublished) ("The ALJ articulated good cause for rejecting [treating physician ]Dr. Kemp's opinion that Costigan was disabled to the point that she could not work[ because, *inter alia*] his findings were based on Costigan's subjective reports

16

and he had no objective medical records on which to base his opinion[, and] his opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques…Substantial evidence supports the ALJ's stated reasons, first, because the physician's opinion did not appear to be based on any objective medical evidence, such as medically acceptable clinical diagnostic techniques or laboratory findings, and, second, no such evidence was part of the record before the ALJ.  Instead, he provided only conclusory statements that certain activities would aggravate Costigan's chronic neck and low back pain or based his findings on Costigan's self-reports of symptoms." (citations omitted)).   Moreover, while Dr. Kidd observed that Robinson was "unable to heel walk due to pain in her heels," he did observe that she was "able to toe walk" and "ambulates without difficulty, without any limp."  (R. 573).

The ALJ also discredited Dr. Kidd's opinion because he found that Robinson's subjective complaints of foot pain to Dr. Kidd were inconsistent with Robinson's longitudinal treatment history and the findings of another orthopedic evaluation. 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").   This other orthopedic evaluation was found at administrative record "Exhibit 30F" (R. 700-15), which, per the ALJ, was a January 21, 2010 "evaluation of left leg pain" performed by Dr. William Suddath of University Orthopaedic Clinic & Spine Center, to whom Robinson was referred after she reported "complaints of left leg/foot pain" while receiving treatment at Hale County Hospital.  (R. 57).  Dr. Suddath's evaluation

occurred approximately eight months after Dr. Kidd's.  The ALJ summarized Dr. Suddath's findings as follows:

> X-rays of the left knee were performed and showed lateral position of the patella, no major arthritic changes, and no femoral shaft abnormalities.  Dr. Suddath diagnosed left patellofemoral syndrome with radial tibial band tightness.  He provided medication management and referred the claimant to physical therapy.  However, on follow-up the claimant reported that she attended only one therapy visit because she injured her other knee and did not feel that she should do therapy on her left knee.  It was noted at this visit, that the claimant's gait and station were normal and she had no instability.  She was advised to return after completing physical therapy, but no additional visits are noted in the record.

(R. 57).

Unlike her evaluation with Dr. Kidd, at Dr. Suddath's evaluation Robinson did not report foot pain, instead describing the pain "as being above the knee and in the lateral aspect of the knee."  (R. 707).  Dr. Suddath accordingly performed x-rays of Robinson's left knee but not her foot.  (R. 57, 707).  Dr. Suddath did not diagnose Robinson for foot pain and observed that Robinson could stand independently on her left leg, that her "gait and station were normal" with "no instability[,]" and that she was "able to heel and toe walk."  (R. 707).

In sum, substantial evidence supports the ALJ's decision to reject Dr. Kidd's medical opinions because those opinions were based only on Robinson's subjective complaints, which the ALJ found not credible regarding their intensity; because those opinions were not supported by any citation to medical signs or lab findings; and because other record evidence was contrary to his conclusions.  Thus, the ALJ did not err in assigning little weight to Dr. Kidd's opinions.

### 2.   Dr. Blanton

Robinson also argues that the ALJ erred in giving less weight to Dr. Blanton's opinion than that of another examining psychologist, Dr. Stutts, "who did not review school records and performed no IQ tests." (Doc. 18 at 4-5). She further argues that, "[b]ecause the ALJ cherry picked facts from the record to support his finding that Ms. Robinson did not meet or equal Listing 12.05(c), and because the record is silent on those facts that would support a finding that she does meet or equal Listing 12.05(c), his decision is not supported by substantial evidence and should be reversed." (*Id.* at 5).

> To establish a disability under section 12.05(C), a claimant must present evidence of a valid verbal, performance, or full-scale I.Q. score of between 60 and 70 inclusive, and of a physical or other mental impairment imposing additional and significant work-related limitation of function. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05(C) (1992)[14]. In addition, the general introduction on "mental retardation and autism" provides that a section 12.05(C) claimant must demonstrate that the retardation is a lifelong condition which manifested itself before age twenty-two. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 (1992).

> Generally, a claimant meets the criteria for presumptive disability under section 12.05(C) when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than "minimal effect" on the claimant's ability to perform basic work activities. *See Edwards by Edwards v. Heckler,* 755 F.2d 1513, 1517 (11th Cir. 1985)...[H]owever,...a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior. *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986) (rejecting a claim of section 12.05(C) mental retardation where the claimant's I.Q. score of 69 was inconsistent with evidence that he had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked

---

[14] The ALJ's September 10, 2010 opinion applied this standard in evaluating § 12.05(C) criteria (*see* R. 55).

19

in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher). Although the ALJ is allowed some leeway to evaluate other evidence when determining the validity of an I.Q. score, an ALJ may not consider a claimant's age, education, and work experience after the ALJ accepts the I.Q. score as valid and finds that the claimant meets or equals the criteria of a listed impairment. *See Ambers v. Heckler,* 736 F.2d 1467, 1470 (11th Cir. 1984) ("consideration of the fact that [claimant] could return to her past work is not a relevant inquiry once she has met the Listing of Impairments in Appendix 1"); 20 C.F.R. § 404.1520(d).

*Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992). *Accord Perkins v. Comm'r, Soc. Sec. Admin.*, 553 F. App'x 870, 872-73 (11th Cir. Jan. 22, 2014) (per curiam) (unpublished).

Dr. Blanton administered an IQ test and reported a full-scale IQ score of 60 for Robinson, placing her "in the mild range of mental retardation at the time of testing" – September 9, 2009. (R. 58). Dr. Blanton also administered a test for depression that placed Robinson in the "severely depressed range." (R. 59). Dr. Blanton concluded that Robinson was "functionally illiterate" and diagnosed "major depression worsened by chronic pain and chronic illness, mild mental retardation, and a global assessment of functioning" representing "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job)." (*Id.*). Dr. Blanton also opined:

> The claimant has marked limitation that seriously interfere [sic] with her ability to perform work-related activities on a day-to-day basis in a regular work setting the following areas: understand and remember simple instructions; carry out simple instructions; remember detailed or complex instructions; remember detailed or complex instructions; use judgment in detailed or complex work-related instructions; and, maintain attention, concentration, and pace for at least two hours. Dr.

20

> Blanton also opined that the claimant's mental retardation has been a lifelong condition and her depression has been present at this level for at least one year. It was also his opinion that the claimant's condition is likely to deteriorate if she is placed under stress, especially that of a job.

(R. 58 (internal citation omitted)).

In determining that Robinson had not satisfied the criteria under § 12.05(C), the ALJ acknowledged that Dr. Blanton's report would appear "at first glance" to satisfy the criteria. (*See* R. 55). However, the ALJ found that Dr. Blanton's report was "entitled to no more than substantial weight[,]" that "the other documentary evidence of record does not demonstrate or support an onset of [an] impairment before age 22 as also required by listing 12.05[,]" and that "the documentary evidence of record, including the claimant's personal and work history, does not demonstrate deficits in adaptive functioning." (*Id.*).

Robinson claims that the ALJ rejected Dr. Blanton's opinion "mainly because it was inconsistent with the opinion of Dr. Stutts, who did not review school records and performed no IQ tests." (Doc. 18 at 5). Dr. Stutts, another examining mental health professional, found Robinson's mental status and cognitive functioning to be "generally unremarkable," estimated her IQ to be "low average to borderline," opined that her abilities to understand, remember, and carry out instructions and to respond appropriately to others was only "moderately impaired," and found that her anxiety symptoms were "in remission." (R. 58, 62).

As the Commissioner correctly notes, however, the ALJ noted that Dr. Blanton's opinions were inconsistent with other record evidence as well. The ALJ

noted that  "school reports within the record" included an IQ score of 75 at age seven, based on the same test performed by Dr. Blanton; and scores of 75 and 80 in the sixth and seventh grades, respectively, based on a different IQ test.  (R. 60). This evidence was contrary to Dr. Blanton's medical opinion that Robinson's mental retardation was "a lifelong condition," despite Dr. Blanton himself having reviewed the school record IQ scores.  The ALJ also noted that record evidence reflected that Robinson had completed high school and received a regular diploma (though she did attend special education classes), that she completed the "lengthy questionnaires required in conjunction with [her SSI application] without any assistance, and that she reported on multiple occasions that she reads newspapers.  (R. 60-61).  This evidence is contrary to Dr. Blanton's determination that Robinson is "functionally illiterate."  The ALJ specifically noted these inconsistencies in assigning less weight to Dr. Blanton's opinion.  (*See* R. 62 (noting that Dr. Blanton's opinion and evaluation stated that Robinson "has multiple marked limitations and that her mental retardation has been 'life-long,' even though the education records he reviewed reported IQ's from 75 to 80").  The ALJ also found significant "the lack of a mental illness treatment history" to corroborate Dr. Blanton's opinions regarding the length and severity of her mental impairments, and he noted that Dr. Blanton's opinion that Robinson was unable to understand and remember simple instructions was not consistent with record evidence indicating "her ability to remain employed for significant periods of time."  (R. 62).  Thus, substantial record evidence supports the ALJ's clearly articulated reasons to give less weight to Dr. Blanton's opinions.

*See Bloodsworth*, 703 F.2d at 1240 (an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion").

Substantial evidence also supports the ALJ's determination that Robinson did not satisfy the criteria of § 12.05(C).   While "an IQ score of 60 through 70 establishes a rebuttable presumption that impairment due to mental retardation was present before age 22 because IQ scores remain fairly constant throughout life[,]" *Perkins*, 553 F. App'x at 873 (citing *Hodges v. Barnhart*, 276 F.3d 1265, 1268–69 (11th Cir. 2001)), the ALJ specifically noted the school record IQ scores that were outside of this range, thus rebutting the presumption afforded to Dr. Blanton's IQ test.   (R. 60).   Moreover, a "diagnosis of mental retardation is insufficient, standing alone, to meet Listing 12.05(C)[,]" and "[a] valid IQ score does not have to be conclusive of mental retardation where the IQ score is inconsistent with other record evidence regarding the claimant's daily living activities and behavior."   *Perkins*, 553 F. App'x at 873-74 (citing *Lowery*, 979 F.2d at 837; 20 C.F.R. § 416.925(d) (explaining an impairment "cannot meet the criteria of a listing based only on a diagnosis," as a claimant must show a "medically determinable impairment[ ] that satisfies *all* of the criteria of the listing" (emphasis added)). Here, the ALJ found that "the documentary evidence of record, including [Robinson]'s personal and work history, does not demonstrate deficits in adaptive functioning."   (R. 55). [15]   Specifically, the ALJ noted that Robinson "lives

---

[15] "While an ALJ may not consider a claimant's work experience after accepting an IQ score as valid and finding that the claimant meets Listing 12.05, here the ALJ determined that [Robinson's] adaptive functioning precluded h[er] from meeting Listing 12.05(C). Accordingly, the ALJ did not err by considering evidence of [Robinson's] work experience

23

independently without a highly supportive living arrangement[,] is able function

independently outside the area of her home[,]…cares for her own personal needs,"

and has "a significant work history." (R. 55, 63). Moreover, Robinson was noted to

have worked as a cook, small products packer, and sewing machine operator, all

"low-end…semiskilled" jobs. (R. 107, 137). Robinson has not argued error in any of

these findings, which indicate that her mental impairments had no more than a

minimal effect on her ability to perform basic work activities. *See Lowery*, 979 F.2d

at 837.[16]  Thus, the ALJ did not err in assign less weight to Dr. Blanton's opinions,

---

and adaptive functioning." *Perkins*, 553 F. App'x at 873 (internal citations omitted).

[16]    Robinson argues that, "rather than discrediting Dr. Blanton's medical opinion and the inclusive IQ scores without any basis in a conflicting medical opinion, the ALJ should have ordered a consultative examination to quiet any doubts the ALJ held about the claimant's mental disability." (Doc. 18 at 5 (citing *Long v. Colvin*, No. 7:12-CV-3715-KOB, 2014 WL 1338503, at *4 (N.D. Ala. Mar. 31, 2014)).

First, "the ALJ did not discredit the validity of [Dr. Blanton's] IQ tests, but only concluded that [Robinson] did not suffer from mental retardation as it is defined under Listing 12.05(C) because h[er] deficits in adaptive functioning were not reflective of mental retardation." *Perkins*, 553 F. App'x at 873.

Second, *Long* is distinguishable from the present case. There, the district court found that the ALJ had "simply reject[ed] a medical opinion regarding mental functioning, with no other existing medical opinion…" *Long*, 2014 WL 1338503, at *15. Here, the ALJ gave "substantial weight" to Dr. Blanton's opinion but assigned more weight to another medical opinion, Dr. Stutts's. As was noted in *Long*,

> [w]hen the evidence shows that the claimant has a mental impairment, the ALJ may determine that the claimant is not disabled " 'only if the [ALJ] has made every reasonable effort' to obtain the opinion of a 'qualified psychiatrist or psychologist.' " *McCall v. Bowen*, 846 F.2d 1317, 1320 (11th Cir.1988) (quoting 42 U.S.C.A. § 421(h)); *see also* 20 C.F.R. § 416.903(e). Because the ALJ has a duty to develop the medical record fully and fairly, "it is reversible error for an ALJ not to order a consultive examination when such an evaluation is necessary for him to make an informed decision." *Holladay v. Bowen*, 848 F.2d 1206, 1209–10 (11th Cir. 1988); *see also Reeves v. Heckler*, 734 F.2d 519, 522 n .1 (11th Cir.1984).

2014 WL 1338503, at *4. Here, the ALJ had the opinions of two qualified mental health professionals, and, because of their inconsistencies, had to make a decision regarding the

and the Court finds that Robinson is due no relief on her claims of error in Claim 1.

## B.    Claim 3

At Step Four, the ALJ determines the claimant's residual functional capacity ("RFC"). *See Phillips*, 357 F.3d at 1238-39. A claimant's RFC "is the most [she] can still do despite [her] limitations[,]" and an ALJ "assess [the] residual functional capacity based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 416.945(a)(1). Moreover, the ALJ must consider all known medically determinable impairments, including those determined not to be "severe" under the applicable SSA regulations. *Id.* § 416.945(a)(2).

In determining Robinson's RFC, the ALJ noted:

> The record reflects that the claimant has a significant history of treatment for diabetes. Early on, the claimant's diabetes were noted as uncontrolled, but non-compliance was also noted. However, after continued treatment, the record reflects controlled diabetes. The claimant attended routine follow-up visits, including laboratory testing. Additionally, nerve conduction studies were performed and returned normal. There is little, if any, evidence of complications related to the claimant's diabetes, and on the whole, the record reflects that she is well controlled. Therefore,…the undersigned finds that the claimant's diabetes is non-severe.

(R. 57 (record citations omitted)).

Robinson argues that the ALJ's RFC failed to adequately account for the effects of her "uncontrolled diabetes mellitus with complaints of dizziness and neuropathy in her lower extremities." (Doc. 18 at 10). However, the Court finds that Robison has failed to demonstrate error in this regard.

---

weight to assign to each. Robinson has provided no reason (other than that she disagrees with the ALJ's decision) to indicate than another examination was necessary for him to make an informed decision.

Robinson cites numerous record exhibits for the general proposition that "[t]he records are replete with references of this condition and its impact on her life." (*Id.* (citing R. 218, 220, 234-238, 241-243, 247, 378, 381, 397-399, 414, 434, 436, 438-441, 443-448, 450-457, 508, 512, 535, 539, 572, 580, 693, 749)). However, her more specific contentions – that "there was no consideration of the decreased sensation in claimant's lower extremities, no consideration for the fatigue to which she testified nor any consideration of her need for frequent (7-8 in a day) bathroom breaks[,]" and that "the ALJ's specific findings....include any mention of the diagnoses made by Dr. Delgado, Dr. Timberlake or Dr. Sudduth with regard to neuropathy and glaucoma, nor does he make any mention of the complaints of dizziness found throughout the record" (*id.*) – are bereft of any record citations; regardless, Robinson has failed to show that the ALJ failed to take this evidence into account. Essentially, Robinson invites the Court to reexamine and reweigh the record evidence regarding her diabetes, which this Court may not do. *See Winschel*, 631 F.3d at 1178. "Furthermore, contrary to [Robinson]'s contention that the ALJ ignored evidence favorable to [Robison], "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision ... is not a broad rejection which is not enough to enable [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam) (quotation and brackets omitted))). "The ALJ's decision in this case was not a broad

rejection and was sufficient to enable...this Court to conclude the ALJ considered [Robison]'s medical condition as a whole." *Id.* Thus, the Court also rejects Robinson's claims of error at Claim 3.

### C.    Claim 2

"At step five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform. An ALJ may make this determination...by obtaining the testimony of a vocational expert[,]" *Winschel*, 631 F.3d at 1180 (citations omitted), as occurred here. In response to the ALJ's RFC assessment of "unskilled" for Robinson, the vocational expert (VE) testified that Robinson "would be able to perform the requirements of representative occupations such as Carding Machine Operator (DOT[17] #681.685-030, sedentary, unskilled, 66,000 jobs in the national economy, and 1,000 jobs in the regional economy), Napper Tender (DOT #585.685-010, sedentary, unskilled, 65,000 jobs in the national economy, and 1,000 jobs in the regional economy), and Small Parts Assembler (DOT #706.685-074, sedentary, unskilled, 142,000 jobs in the national economy, and 1,400 jobs in the regional economy." (R. 64, 139).[18] When asked by the ALJ whether his testimony was consistent with the DOT, the VE responded: "For the most part, yes, sir[,]" noting that he had used his experience in addressing the ALJ's "sit/stand option" hypothetical because it is not addressed by the DOT. (R. 141). The ALJ found the VE's testimony to be "consistent with the

---

[17] *Dictionary of Occupational Titles*
[18] The ALJ appears to have relied only on the VE testimony from Robinson's second SSA hearing. As such, the Court need not address Robinson's claims of error in VE testimony from the first hearing.

information contained in the" DOT. (R. 64).

Robinson argues that the VE's testimony is flawed, and the ALJ erred in relying on it, because the DOT lists the jobs of napper tender and small parts assembler as each having a "specific vocational preparation" (SVP) time of 3, which corresponds to "semi-skilled" rather than "unskilled" work. *See* SSR 00-4P (S.S.A. Dec. 4, 2000).

> At Step Five,
>
> "[W]hen the VE's testimony conflicts with the DOT, the VE's testimony 'trumps' the DOT." *Jones v. Apfel,* 190 F.3d 1224, 1229–30 (11th Cir. 1999). When an apparent conflict between the VE's testimony and the DOT arises, however, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE['s testimony]." *See* SSR 00–4p; 65 Fed. Reg. 75759 (Dec. 4, 2000). The ALJ must also "[e]xplain ... how any conflict that has been identified was resolved." *Id.*

*Leonard v. Comm'r of Soc. Sec.*, 409 F. App'x 298, 300-01 (11th Cir. 2011) (per curiam) (unpublished). *Accord Warren v. Astrue*, 830 F. Supp. 2d 1369, 1374 (S.D. Fla. 2011).

The Commissioner does not attempt to argue that there was no conflict between the VE's testimony and the DOT, or that the ALJ adequately resolved the conflict. Rather, the Commissioner asserts "case law holds that an ALJ commits no harmful error under these circumstances where at least one of the jobs the ALJ found was available to Plaintiff involves no inconsistencies." (Doc. 19 at 12 (citing *Williams v. Astrue*, No. 208-CV-477-FTM-29SPC, 2009 WL 2045339, at *2 (M.D. Fla. July 8, 2009)). As such, because Robinson "does not object to the carding machine operator position, and a review of the record and DOT shows that this

28

position bears no inconsistencies with the ALJ's RFC or the DOT[,]...the ALJ's error in citing the other jobs as available, if any, is harmless." (*Id.* at 13).

The Court finds that,

> [e]ven assuming *arguendo* that the ALJ incorrectly found that the VE's testimony was consistent with the DOT, such error was harmless. *See Diorio v. Heckler,* 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis to ALJ's incorrect statements that were irrelevant to whether claimant had a severe impairment). In this Circuit, a VE's testimony trumps the DOT to the extent the two are inconsistent. *See Jones*[ *v. Apfel*], 190 F.3d at 1229–30. The VE opined that the ALJ's hypothetical person could perform these three jobs. The ALJ was permitted to base his findings about these three jobs exclusively on the VE's testimony, irrespective of any inconsistency with the DOT, and was not required to seek further explanation. *See id.*

*Jones v. Comm'r of Soc. Sec.*, 423 F. App'x 936, 939 (11th Cir. 2011) (per curiam) (unpublished).[19]   *Accord Miller v. Comm'r of Soc. Sec.*, 246 F. App'x 660, 661-62 (11th Cir. 2007) (per curiam) (unpublished) ("Even assuming that an inconsistency existed between the testimony of the vocational expert and the DOT, the ALJ did not err when, without first resolving the alleged conflict, he relied on the testimony of the vocational expert. Our precedent establishes that the testimony of a vocational expert 'trumps' an inconsistent provision of the DOT in this Circuit. (citing *Jones v. Apfel*, 190 F.3d at 1229–30)); *Hurtado v. Comm'r of Soc. Sec.*, 425 F.

---

[19] "SSR 00–4p...provides that "[n]either the DOT nor the [VE's testimony] automatically 'trumps' " and instructs the ALJ to "elicit a reasonable explanation" for a conflict between the two before relying on the VE's testimony. SSR 00–04p, 2000 WL 1898704 (Dec. 4, 2000). Social Security Rulings are not binding on this Court. *See B.B. v. Schweiker,* 643 F.2d 1069, 1071 (5th Cir. Unit B Apr. 1981); *see also Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir. 1982) (providing that [the Eleventh Circuit is] bound by decisions issued by Unit B panels of the former Fifth Circuit). To the extent SSR 00–4p conflicts with *Jones*[ *v. Apfel*], [this Court is] bound by *Jones*..." *Jones v. Comm'r of Soc. Sec.*, 423 F. App'x at 939 n.4.

App'x 793, 796 (11th Cir. 2011) (per curiam) (unpublished).

Moreover, *Williams v. Astrue*, 2009 WL 2045339  (M.D. Fla. July 8, 2009), to which the Commissioner has cited, found that where "one of the three jobs…bears no inconsistency between the Vocational Expert evidence and the DOT, the error was harmless and the ALJ's decision can be upheld if the number of available jobs is sufficient to satisfy the Commissioner's burden at Step 5."  2009 WL 2045339, at *3 (citing *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) (unpublished) ("[E]ven if the two positions about which there were inconsistencies had been excluded, the ALJ still could have reasonably found that Martin could perform the third position of assembler."); *Coleman v. Astrue*, 269 F. App'x 596, 601–02 (7th Cir. 2008) (per curiam) (unpublished)).  Here, the VE testified, and the ALJ accepted, that there 66,000 carding machine operator jobs in the national economy, 1,000 of which were in the regional economy.  This constitutes a significant number of available jobs; thus, any erroneous reliance by the ALJ on the other two positions listed by the VE was harmless.  *Cf. Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) ("The VE also testified that there are 174 [small appliance repair] positions in the area where Allen resides. In addition to this testimony, the record contains evidence that there are some 1,600 general appliance repair jobs in the State of Georgia and some 80,000 such jobs nationwide… On the basis of this testimony and the other evidence of record, we find that substantial evidence supports the Secretary's decision."); *Martin*, 170 F. App'x 369, 375 ("Contrary to Martin's position, 870 jobs can constitute a significant number in the geographic

region. *See Stewart v. Sullivan*, 904 F.2d 708 (6th Cir. 1990) (125 jobs in the local area is a significant number of jobs)); *Coleman*, 269 F. App'x at 602 ("We have held that 1,400 jobs falls within the parameters of a sufficiently significant occupational base. *Lee v. Sullivan,* 988 F.2d 789, 794 (7th Cir. 1993) (citing cases holding that even fewer than 750 available positions amounts to a significant occupational base). The ALJ's failure to comply with SSR 00–4p was therefore harmless as, at the very least, a significant number of jobs cited by the ALJ and not inconsistent with the DOT remained available to Coleman.").

For these reasons, the Court rejects Robinson's claims of error at Step Five in Claim 2.

## V.    Conclusion

In accordance with the foregoing analysis, it is **ORDERED** that the Commissioner's final decision issued January 14, 2014, denying Robinson's application for SSI benefits is **AFFIRMED** under 42 U.S.C. § 1383(c)(3).

Final judgment shall issue separately in accordance with this Order and Federal Rule of Civil Procedure 58.

**DONE** and **ORDERED** this the 2nd day of April 2015.

*/s/ Katherine P. Nelson*
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**